**UNITED STATES DISTRICT COURT FOR**
**THE SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| **CLAYON ADAMY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Civil Action No. 1:26-cv-9894** |
| **vs.** | ) | |
| | ) | |
| **JETBLUE AIRWAYS CORPORATION, EMBRAER, S.A., EMBRAER AIRCRAFT HOLDING, INC., EMBRAER AIRCRAFT CUSTOMER SERVICES, LLC, EMBRAER ENGINEERING & TECHNOLOGY CENTER, USA, INC., HONEYWELL AEROSPACE US LLC, HONEYWELL AEROSPACE US INC., and HONEYWELL AEROSPACE TECHNOLOGIES,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

## COMPLAINT

Now comes the Plaintiff, CLAYTON ADAMY and alleges as follows:

## PARTIES

1. Plaintiff, CLAYTON ADAMY, is a resident of Prospect, Kentucky.

2. Defendant **JETBLUE AIRWAYS CORPORATION** (JETBLUE) is a Delaware corporation with a principal place of business at 27-01 Queens Plaza North, Long Island City, New York 11101, in the County of Queens, City and State of New York.

3. Defendant JETBLUE is a foreign corporation authorized to do business in the State of New York with a principal place of business at 27-01 Queens Plaza North, Long Island City, New York 11101, in the County of Queens, City and State of New York.

4. Defendant JETBLUE is a common carrier under 14 C.F.R. Part 121 engaged in the business of transporting passengers for hire by air and, in furtherance thereof, operates regularly scheduled flights.

5. Defendant JETBLUE is a common carrier under 14 C.F.R. Part 121 engaged in the business of transporting passengers for hire by air and, in furtherance thereof, operates "maintenance flights" for the purpose of bringing planes from one location to another.

6. At all times relevant to this complaint, Defendant JETBLUE operates a fleet of aircraft, including Embraer ERJ-190 with registration N273JB.

7. At all times relevant to this complaint, Defendant JETBLUE operates a fleet of aircraft, including Embraer ERJ-190 equipped with Honeywell Aerospace auxiliary power units ("APU's").

8. At all times relevant to this complaint, Defendant JETBLUE operates a fleet of aircraft, including Embraer ERJ-190 equipped with Honeywell Aerospace environmental control systems ("ECS's").

9. Defendant JETBLUE has experienced numerous "fume events," which are incidents in which dangerous toxic chemicals are released into the cabin of the aircraft, and will be discussed in further detail below.

10. Plaintiff was injured in a fume event on a Defendant JETBLUE maintenance flight that utilized Embraer ERJ-190 with registration N273JB equipped with Honeywell APU and ECS from Patrick Leahy Burlington International Airport (BTV) to John F. Kennedy International Airport (JFK) on November 29, 2023.

11. Defendant JETBLUE had notice of fume events in general, and fume events on the subject Embraer ERJ-190 with registration N273JB equipped with Honeywell APU and ECS, in particular, on November 28, 2023.

12. Defendant JETBLUE concealed prior fume events, including that of the subject Embraer ERJ-190 with registration N273JB equipped with Honeywell APU and ECS from flight crews and the flying public, in general, and Plaintiff, in particular, despite the health dangers fume events pose.

13. Defendant JETBLUE and its agents acted as a maintained separate and apart from its capacity as a common carrier.

14. Defendant JETBLUE and its agents knowingly and intentionally exposed its crew and passengers to toxic chemicals and deliberately lied about its knowledge of the existence of these defects.

15. Defendant **EMBRAER, S.A.** is a Brazilian corporation with an American headquarters and principal place of business 276 SW 34th St, Fort Lauderdale, FL 33315.

16. Defendant **EMBRAER AIRCRAFT HOLDING, INC.** is a Delaware Corporation with a principal place of business at 276 SW 34th Street, Fort Lauderdale, Florida 33315.

17. Defendant **EMBRAER AIRCRAFT HOLDING, INC.** is a foreign corporation duly authorized to do business in the State of New York with a registered agent at Corporate Creations Network Inc., 600 Mamaroneck Avenue, #400, Harrison, New York 10528.

18. Defendant **EMBRAER AIRCRAFT CUSTOMER SERVICES, LLC** is a Florida limited liability company with a principal place of business at 276 SW 34th Street, Fort Lauderdale, Florida 33315.

19. Defendant **EMBRAER AIRCRAFT CUSTOMER SERVICES, LLC** is a foreign limited liability company duly authorized to do business in the State of New York with a registered agent at Corporate Creations Network Inc., 600 Mamaroneck Avenue, #400, Harrison, New York 10528.

20. Defendant **EMBRAER ENGINEERING & TECHNOLOGY CENTER, USA, INC.** is a Delaware Corporation with a principal place of business at 1400 General Aviation Drive, Melbourne, Florida 32935.

21. Defendants **EMBRAER, S.A.**, **EMBRAER AIRCRAFT HOLDING, INC.**, **EMBRAER AIRCRAFT CUSTOMER SERVICES, LLC**, and **EMBRAER ENGINEERING & TECHNOLOGY CENTER, USA, INC.** are collectively referred to herein as "EMBRAER DEFENDANTS."

22. EMBRAER DEFENDANTS are corporations and limited liability corporations doing business in the United States of America to manufacture, service and distribute airplanes on behalf of a parent company founded in Brazil, known as Embraer Aerospace.

23. EMBRAER DEFENDANTS operate manufacturing facilities in multiple states and their airplanes fly in an out of New York's airports, including JFK, on a daily basis.

24. At all times relevant to this Complaint, EMBRAER DEFENDANTS were engaged in the business of designing, manufacturing, assembling, testing, servicing, marketing, promoting, leasing, and selling commercial aircrafts, including ERJ-190 aircraft, and particularly the Embraer ERJ-190 with registration N273JB.

25. At all times relevant to this Complaint, EMBRAER DEFENDANTS were engaged in the business of providing information and warnings about such aircrafts, including

ERJ-190 aircraft, and particularly the Embraer ERJ-190 with registration N273JB, and generate substantial revenues from the use of their aircraft(s) within the State of New York.

26. EMBRAER DEFENDANTS markets its products and services in New York, engaged in contracts with New York companies, including Defendant JETBLUE and HONEYWELL DEFENDANTS (*infra*).

27. EMBRAER DEFENDANTS jet engines, including particularly the Embraer ERJ-190, are designed and manufactured defectively, unnecessarily exposing crew members, including Plaintiff herein, and passengers to toxic chemicals and fumes that can cause catastrophic neurological injuries.

28. Defendant **HONEYWELL AEROSPACE US INC.** is a Delaware Corporation with its principal place of business in Phoenix, Arizona 85034.

29. Defendant **HONEYWELL AEROSPACE US INC.** is a foreign corporation authorized to do business in the State of New York with a registered agent at Corporation Service Company, 80 State Street, Albany, NY, 12207-2543.

30. Defendant **HONEYWELL AEROSPACE US LLC** is a Delaware Limited Liability Company with its principal place of business in Phoenix, Arizona 85034.

31. Defendant **HONEYWELL AEROSPACE US LLC** is a foreign limited liability company authorized to do business in the State of New York with a registered agent at Corporation Service Company, 80 State Street, Albany, NY, 12207-2543.

32. Defendant **HONEYWELL AEROSPACE US INC.** is now known as **HONEYWELL AEROSPACE US LLC** as of September 26, 2025.

33. Defendant **HONEYWELL AEROSPACE US LLC** is the successor-in-interest to Defendant **HONEYWELL AEROSPACE US INC.**

34. Defendant **HONEYWELL AEROSPACE US INC.** and subsequently Defendant **HONEYWELL AEROSPACE US LLC**, does business as **HONEYWELL AEROSPACE TECHNOLOGIES**, which also maintains its principal place of business at 1944 E. Sky Harbor Cir N, Phoenix, Arizona 85034.

35. Defendants **HONEYWELL AEROSPACE US INC., HONEYWELL AEROSPACE US LLC**, and **HONEYWELL AEROSPACE TECHNOLOGIES** are collectively referred to herein as the "HONEYWELL DEFENDANTS."

36. The HONEYWELL DEFENDANTS acted in concert with each other, as corporate alter egos, successors-in-interest, predecessors-in-interest, joint venturers, as agents, as an enterprise, and/or otherwise collaborated in the design, manufacture, and sale of the subject APU and ECS.

37. The HONEYWELL DEFENDANTS manufacture the APUs and ECSs used by airplane manufacturers, including EMBRAER DEFENDANTS.

38. The HONEYWELL DEFENDANTS manufacture the APUs that are used in Embraer ERJ-190 planes, and particularly the Embraer ERJ-190 with registration N273JB.

39. The HONEYWELL DEFENDANTS manufacture the ECSs that are used in Embraer ERJ-190 planes, and particularly the Embraer ERJ-190 with registration N273JB.

40. The HONEYWELL DEFENDANTS also coordinated in the coverup of the defects in the APU and ECS and harms associated with fume events, and failed to fix known defects in their products.

## FACTS

41. At all times relevant to the claims herein, Plaintiff was employed as a pilot by Defendant JETBLUE.

42. JETBLUE is a Delaware corporation, headquartered in Long Island City, New York, State of New York.

43. JETBLUE operates passenger service throughout the United States and North America on commercial airliners.

44. JETBLUE purchases jet airplanes from various manufacturers, including EMBRAER DEFENDANTS.

45. JETBLUE leases jet airplanes from various manufacturers, including EMBRAER DEFENDANTS.

46. JETBLUE leased the subject Embraer ERJ-190 with registration N273JB in June 2007 and it was in use at all times relevant to the claims herein.

47. EMBRAER DEFENDANTS use APUs and ECSs manufactured by HONEYWELL DEFENDANTS in their aircraft, including the subject Embraer ERJ-190 with registration N273JB.

48. On November 28, 2023, JETBLUE reported a fume event on the subject Embraer ERJ-190 with registration number N273JB during a flight to Burlington, Vermont (BTV). An air return was performed due to maintenance (odor event) with the flight deck reporting a strong dirty sock smell at takeoff. No emergency was declared. Passengers did not request medical attention. The flight was swapped. The flight deck crew and inflight crew was re-crewed and they were informed to call Medair.

49. On November 29, 2023, Plaintiff was injured while piloting the subject Embraer ERJ-190 with registration N273JB during a maintenance flight from BTV and to New York (JFK) during takeoff and landing. Plaintiff had to reboard the plane shortly after landing because he forgot his bags.

50. Plaintiff sought medical care due to severe lung pain, neurological issues and confusion. Plaintiff filed for workers' compensation.

**FACTS: THE AIRCRAFT AND FUME EVENTS**

51. Bleed air refers to air on an aircraft that comes into the cabin via its bleed air system. An APU and an ECS work together to manage aircraft cabin comfort, power, and air supply. A bleed air system uses a network of ducts, valves and regulators to conduct medium to high pressure air, "bled" from the compressor section of the engine(s) and APU to various locations with in the aircraft. The ECS is the system responsible for cabin pressurization, temperature control, fresh air ventilation, avionics cooling, and smoke/fire extraction. The ECS relies on high-pressure bleed air tapped from the main engine compressors or the APU (on the ground or via cross-bleed in flight).

52. EMBRAER jet engines are equipped with air compressors divided into two sides, known in the industry as the "wet side" and the "dry side."

53. The "dry" side helps supply oxygen to passengers. Airplanes rely on pressurized air to sustain human life when flying at high altitudes. The pressurized air, known as "bleed air," is supplied directly from the dry side of the compressor into the cabin with no filtration.

54. Bleed air is extremely hot (between 200 and 250 degrees Celsius) and very high in pressure. After leaving the engine and passing through an air-conditioning pack, where it is cooled, the bleed air is combined with recirculated cabin air before it enters the cabin at a ratio of 50/50. However, in the cooling process, the bleed air is not cleaned or filtered.

55. On the "wet" side, the air compressor acts as an exhaust system, which dispels toxic gas caused by super-heated synthetic chemicals used as oil to lubricate the engine. The engine oils contain a percentage of highly toxic organophosphate additives as anti-wear agents.

The oil becomes partially decomposed, i.e. chemically altered (‘pyrolysed’/therman degradation) due to the extremely high temperatures in the jet engine.

56. Bleed air is also used to pre-pressurize the hydraulic systems (hydraulic pumps, and some actuators are mounted in the engines). The extremely high pressure of aircraft hydraulic systems (>10 MPa) creates “sweats,” leaks and/or ruptures. The overall result is that the interior air of an aircraft utilizing such a system can, and do, become contaminated by hydraulic fluid in addition to the engine lubricating oil and other substance that are toxic to humans.

57. The gases and fumes from this process are so toxic that a 1972 Circular published by the Federal Aviation Administration (“FAA”) includes a paragraph titled “IS YOUR AIRCRAFT A DEATH TRAP?”

58. EMBRAER jet engines are designed in such a way so that air from the dry side and the wet side mix, rendering the oxygen filtered into the cabin highly toxic and unfit for human consumption.

59. That is because so-called “wet-seals” are used to keep the toxic exhaust fumes and bleed air separated so toxic gases area not released into the cabin. However, wet-seals are not really seals at all, they are controlled leakage devices. In other words, a certain amount of toxic gas mixes with the cabin air by design, meaning that there is at least some level of toxicity in the cabin at all times. In fact, it is well established that bleed air from the engine design utilized by EMBRAER can be contaminated with at least 127 toxic substances during normal operations, including whole resting on the tarmac and during flight.

60. The toxicity levels can become acutely dangerous when the engine is first started or when wet seals fail entirely – incidents which are known as “fume events.”

61. All jet engine lubricating oil and/or aircraft hydraulic fluid are harmful to humans with various degrees of toxicity as are other substances that make their way into the cabin due to bleed air systems.

62. Fume events can occur when the plane is resting on the tarmac, particularly when the engine is first started and especially if maintenance technicians did not “bleed the engines” prior to starting them.

63. “Bleeding the engines” is the process of running the engines prior to letting humans board the plane in order to allow sufficient time for toxic gases to pass through the plane without human exposure.

64. During acute fume events, passengers have reported abnormal odors, often described as chemical, oily, or a “dirty socks” smell.

65. These smells are the by-product of as many as 127 other toxic contaminants and gases.

66. Gases contained in contaminated cockpit/cabin air as constituents of “bleed air” include carbon monoxide (“CO”) from engine exhaust and carbon dioxide (“CO2”) as a product of incomplete combustion. Exposure to high CO2 concentrations can lead to symptoms such as headache, dizziness, and restlessness and, ultimately, lead to asphyxia.

67. Vapors contained in contaminated cockpit/cabin air may also include both volatile (“VOCs”) and semi-volatile organic compounds (“SVOCs”), both of which are chemical compounds based on carbon chains or rings that also contain hydrogen – with or without oxygen, nitrogen, and other elements that represent constituents of jet engine oils, hydraulic fluids, and deicing fluids.

68. Among the possible VOCs and SVOCs representing constituents of contaminated bleed air, particular concern has been attributed to tricresyl phosphates ("TCPs"), N-phenyl-L-naphthylamine ("PAN"), and CO. TCPs are anti-wearing agents that are added to all get engine oils used on jet propelled commercial airliners in the United States.

69. TCPs are known neurotoxins, i.e., nerve agents. A neurotoxin or nerve agent is a toxin that acts specifically on the nervous system.

70. TCPs are organophosphates. Organophosphates are chemical compounds use in insecticides, herbicides, pesticides, nerve agents and nerve gases, all sharing a similar chemical structure. Organophosphates, as a family of chemicals, are considered toxic to human health. Indeed, in 2001, the Environmental Protection Agency banned most residential uses of organophosphates, in part because of their risk to human health.

71. Inhaling toxic cabin bleed air can cause serious, and permanent, personal injuries to those exposed, including Plaintiff herein.

72. The chemical constituents of burning or heated jet engine oil and its byproducts, include, but are not limited to, neurotoxins such as organophosphates.

73. In 1994, the U.S. Congress mandated that the Federal Aviation Administration ("FAA") establish an aircraft cabin air quality research program and to collaborate with the Centers for Disease Control and Prevention (CDC) to carry out studies specific to cabin air quality (Public Law 103-305, 1994).

74. In 1999, the FAA reviewed its event database between January 1978 and December 1999 involving "air quality." Of the 240 events identified in the search, about 60 were "airplane ventilation toxic contaminant events." Of the 60 or so events, 24 times crew members

reported their performance was impacted. Upon information and belief, this is only a small fraction of such events.

75. On November 29, 2001, JETBLUE issued 2001-T040, "Cabin Oil Fumes From 131-9A APU," in reference to an event that occurred on November 27, 2001 to notify the crew that the HONEYWELL APU is possible source of oil fumes in the aircraft cabin as a result to an advisement issued by Airbus, another airline manufacturer utilizing the bleed air system.

76. HONEYWELL investigated and found the APU's load compression carbon seal was worn. As a result of the worn seal, the oil leaks in the APU Load Compressor air path and into the ECS, where oil accumulates and worsens over time, especially during all phases of flight. HONEYEWLL was to advise of findings and corrective action, but no adequate corrective action was taken.

77. The FAA Modernization and Reform Act of 2012 required the FAA to establish a research program focused on aircraft engine/APU bleed air.

78. In November 2015, the FAA's Aerospace Medicine Technical Report No. DOT/FAA/AM-15/20 was published. It noted that "[t]he quality of air distributed throughout the cockpit and cabin during air transportation in a pressurized aircraft is critically important to human health. For more than 30 years, the topic of cabin air quality has been of concern."

79. In June 2017, Dr. Susan Michaelis, a former pilot and renowned expert in the field of aviation safety published research on contaminated air. The article titled "Aerotoxic Syndrome: A New Occupational Disease?" concluded that there was a cause and effect relationship existed between identified aircrew symptoms, diagnoses, etc. and contaminated air in the occupational environment.

80. Aerotoxic Syndrome and fume events has been a frequent topic in the national news.

81. On August 11, 2017, a JetBlue flight was forced to make an emergency landing in Buffalo, New York after fumes caused passengers and crew to become ill. Three crew members were hospitalized.[1,2]

82. On December 24, 2018, a JetBlue aircraft was forced to make an emergency landing in New York City because of a fume event.[3]

83. Aerotoxic Syndrome and fume events are so pervasive that the U.S. Congress has written to JetBlue. By letter dated September 19, 2019, House of Representatives member John Garamendi and Senator Richard Blumenthal sought information from JetBlue about multiple fume events on planes manufactured by the Defendants.[4]

84. Subsequently, during its 117th session, the U.S. House of Representatives of Congress considered a bill establishing safety standards for air supply on aircraft (H.R. 7267 March 29, 2022) seeking to mandate cabin air monitoring, required training for crew, and established reporting requirement for smoke and/or fume events.

85. The bleed air system, while common, is not the only available system for the design and manufacture of aircrafts – a safer design exists that eliminates the risk of these events entirely.

86. In 2004, three years before JETBLUE leased the subject Embraer ERJ-190 with registration N273JB, Boeing, a competitor of EMBRAER, launched the Boeing 787 Dreamliner,

---

[1] https://www.newyorkupstate.com/buffalo/2017/08/flight_makes_emergency_landing_in_buffalo_after_crew_members_become_ill.html
[2] https://www.youtube.com/watch?v=sKTn9sWOFb8
[3] https://pix11.com/news/jetblue-plane-makes-emergency-landing-in-nyc-on-christmas-eve-due-to-unusual-odor-officials/
[4] https://www.twu.org/release-rep-garamendi-sen-blumenthal-demand-answers-after-disturbing-pattern-of-jetblue-toxic-fume-events/ andhttp://www.unfiltered.vip/uploads/6/0/3/8/6038702/blumenthal_letter_to_jetblue.pdf

a commercial aircraft that does not use a bleed air system. The Dreamliner air system eliminates entirely the risk of engine oil decomposition products being introduced in the cabin air supply.

87. One of the reasons Boeing developed the bleed free air supply system on the Dreamliner was to eliminate "engine contaminants potentially entering cabin air supply – Improved Air Quality."

88. Since at least 2004, EMBRAER has had the option to manufacture aircraft, including the subject Embraer ERJ-190 with registration N273JB, with the same or similar design as the Dreamliner and could have greatly reduced, if not eliminated entirely, the risk of harm to passengers and crew, including Plaintiff herein.

89. Such so-called "no-bleed" systems are more fuel efficient and environmentally sound. Such systems reduce maintenance times and costs by replacing complex bleed-air systems with simpler, more reliable compressor-based system. Such systems reduce aircraft weight while improving aircraft reliability and performance.

90. Various aircraft manufacturers acknowledge that no-bleed systems improve air quality and eliminate "engine contaminants potentially entering cabin air-supply."

91. Since at least 2004, JETBLUE had the option to lease the Boeing Dreamliner so as to remove the risk of toxic fume events injuring passengers and crew, including Plaintiff herein.

92. Airplanes currently manufactured by EMBRAER DEFENDANTS could be modified to lessen and/or eliminate the risk of fume events entirely without placing an undue burden on the manufacturer through the use of filtration and warning systems.

93. The risk of catastrophic injury could be lessened or eliminated entirely through the use of proper warnings and personal protective equipment.

94. JETBLUE, HONEYWELL DEFENDANTS and EMBRAER DEFENDANTS have been on notice of this defective design and the catastrophic injuries caused by the defective design for decades. Fume events occur as often as five times a day in the United States alone. Multiple industry publications, lawsuits, government investigations, and other public sources of information have confirmed hundreds, if not thousands, of catastrophic injuries caused by toxic exposures due to the bleed air system.

**FACTS: PLAINTIFF'S INJURIES**

95. On November 29, 2023, Plaintiff, a pilot with six years' experience at JETBLUE, boarded the subject Embraer ERJ-190-100 IGW, a fixed wing multi-engine airplane with 100 passenger seats - with FAA registration number N273JB, Serial Number 50531153 (hereinafter referred to as "the AIRCRAFT"), which was operated by JETBLUE. He was the pilot for a maintenance flight from BTV to JFK. Thus, there were no passengers on the flight, and a crew of one probational first officer. The flight took about an hour.

96. The AIRCRAFT was designed, manufactured, and sold by EMBRAER DEFENDANTS in 2007 and utilized the unreasonably dangerous bleed air system described above.

97. When the engine was started, Plaintiff immediately noted the noxious scent but then went nose blind and thought it dissipated. When they landed in JFK, the maintenance crew got on and could smell the stench immediately and indicated alarm that Plaintiff and his first mate were still breathing in the noxious air.

98. Plaintiff forgot his bag on the flight and had to reboard to get it and noticed the smell, which had increased exponentially.

99. This fume event was reported to JETBLUE contemporaneously, as was the one that occurred on the exact same plane the day before.

100. He went home and took a shower and slept. The next morning, his ribs and lungs hurt like razor blades and he had chest pain and shortness of breath.

101. He presented to Mt. Sinai Hospital in New York City, New York on November 30,2023 where he was assessed and diagnosed with inhalation injury. He was given Tylenol and albuterol and told to follow up with his primary care provider in two weeks.

102. On December 5, 2023, Plaintiff presented to Mt. Sinai Hospital again with persistent chest tightness and cough. Doctors diagnosed Plaintiff with pneumonitis secondary fto fume inhalation. He was prescribed prednisone and referred to outpatient pulmonology.

103. The FAA requires medical certification/standards for pilots. Due to Plaintiff's physical and neurological symptoms, his medical certification was revoked.

104. In 2024, Plaintiff begins treating with Norton Pulmonary Specialists in Louisville, Kentucky for his ongoing symptoms and in hopes that he would be able to return to work.

105. He is diagnosed with reactive airway dysfunction due to inhalation of noxious gases and continues to complain of shortness of breath, cough, chest tightness and wheezing without a contributory medical history.

106. In October, 2025, Plaintiff begins treating with OSU Wexner Medical Center in Grandview Heights, Ohio and experienced a syncope (fainting) episode following an arterial line removal during a bicycle stress test. The episode was captured on echocardiogram (ECG).

107. Fourteen-day cardiac monitoring is initiated revealing one run of non-sustained supraventricular tachycardia, supraventricular ectopy and ventricular ectopy.

108. On November 19, 2025, Plaintiff has a CT Angiogram showing no evidence of coronary artery disease and normal heart structure and function.

109. On January 21, 2026, a "tilt table test" was positive for vasodepressor (neurocardiogenic) syncope, negative for cardioinhibitory syncope and POTS. Ventricular bigeminy and trigeminy are noted. Plaintiff lost consciousness during isoproterenol infusion.

110. Plaintiff is recognized as fully disabled by Workers' Compensation.

111. Plaintiff has tried to recertify but his condition precludes him from operating aircraft from the date of the event up to and including today.

112. As a result, Plaintiff is incurably, totally and permanently disabled. Plaintiff has suffered substantial medical bills, lost wages, mental anguish, pain and suffering; and in the future, Plaintiff will suffer substantial medical bills, loss of earnings potential, mental anguish, pain, suffering, and overall decrease in the quality of his life.

113. Defendants' joint and several negligence is the direct and proximate cause of Plaintiff's illness and injuries.

## **JURISDICTION AND VENUE**

114. Jurisdiction and venue are proper in the United States District Court for the Southern District of New York.

115. Defendants are all foreign entities registered to do business in the State of New York, and JETBLUE has its principal place of business in Queens, New York.

116. The events complained of herein substantially occurred in the air between Burlington, Vermont and Queens, New York, and particularly JFK airport, located in Queens, New York.

117. The EMBRAER DEFENDANTS sold and/or leased the Embraer family of aircraft, including the subject AIRCRAFT, to JETBLUE, which is based in New York.

118. The Purchase Agreement between JETBLUE and EMBRAER DEFENDANTS dated June 9, 2003 specifies New York Law as the "Applicable Law" and recognizes the jurisdiction of the United States District Court for the Southern District of New York.

119. The EMBRAER DEFENDANTS and HONEYWELL DEFENDANTS investigated, coordinated, engaged in a continuous course of conduct, and conspired together to keep the severity and frequency of fume events that were occurring in the EMBRAER DEFENDANTS' fleet, including the subject AIRCRAFT, from the FAA, crewmembers and passengers.

120. Defendants engaged in tortious activity in concealing the nature of fume events from the FAA, Plaintiff and the public through its business relationship centered in New York.

121. Defendants engaged in continuous and systematic business activities in the State of New York, including but not limited to, transacting business, contracting to supply goods and services, and engaging in tortious conduct in the State.

122. Defendants delivered their goods and services into the stream of commerce with the expectation that they would be purchased and used in the State of New York.

123. Defendants derive substantial revenue from business in New York such that the requirements from general and/or specific jurisdiction, together with the requisite minimum contacts are satisfied.

124. Defendants, at all times material hereto, assumed all responsibility for providing inspection, repair, service, maintenance, replacement, overhaul, warnings, parts, instructions, maintenance manuals, continuing airworthiness information, and other information with respect to the AIRCRAFT.

125. Defendants have entered into contracts and warranty agreements with individuals and entities located in New York State.

126. The parties are citizens of different states and/or countries.

127. The amount in controversy exceeds $75,000.00, exclusive of costs.

128. Venue in this District satisfies the requirements of 28 U.S.C. § 1391, in that the Defendants are subject to personal jurisdiction because they transact business in this District.

## COUNT I – NEGLIGENCE

129. Plaintiff repeats and incorporates herein the preceding paragraphs as if each is set forth here in its entirety.

130. Defendants designed, manufactured, inspected, tested, marketed, owned, leased distributed, repaired, retrofitted and/or sold the subject AIRCRAFT.

131. Defendants had a duty to exercise reasonable care in the design, manufacture, inspection, testing, marketing, repair, retrofit or sale of Embraer ERJ-190 in general, and the subject AIRCRAFT, in particular, so as to guard against foreseeable and avoidable risks of harm attendant with its use.

132. Defendants breached their duty to exercise reasonable care in the design, manufacture, inspection, testing, marketing, distribution, repair, retrofit or sale of Embraer ERJ-190 in general, and the subject AIRCRAFT, in particular, so as to guard against foreseeable and avoidable risks of harm attendant with its use.

133. It was feasible to design the product in a safer manner and/or retrofit those aspects of the original design that were unreasonably dangerous.

134. Defendants breached their duty to exercise reasonable care when they placed in the channels of trade or commerce a product which they knew or reasonably should have known was dangerous, defective and/or not reasonably safe for its intended use and purpose.

135. Defendants were negligent in failing to adequately warn and/or instruct the users of Embraer ERJ-190 in general, and the subject AIRCRAFT, in particular, about the potential hazards associated with the use of Embraer ERJ-190 in general, and the subject AIRCRAFT, in particular,.

136. Defendants failed to warn about the dangers, frequency and scope of harm that a cabin air fume event could cause upon exposure/inhalation and further how one could protect oneself or how the user of Embraer ERJ-190 in general, and the subject AIRCRAFT, in particular, could minimize the risk.

137. Defendants failed to provide proper instructions and guidelines, studies or data in its aircraft operation manuals and literature accompanying the sale of Embraer ERJ-190 in general, and the subject AIRCRAFT, in particular,.

138. Defendants failed to update warnings and instructions post sale and notify known users of the Embraer ERJ-190 in general, and the subject AIRCRAFT, in particular, as more information became available about the dangers of cabin air fume exposure.

139. Defendants failed to develop mitigation strategies which airline operators – i.e. JetBlue - could consider to employ for the benefit of its pilots and air transportation workers such as the Plaintiff.

140. Defendants failed to conduct adequate testing and post marketing sales surveillance capturing data and incidence rates which reasonably would have led to earlier warnings and guidance on available steps that both airlines and operators of its aircraft might employ to mitigate or avoid the risk of air cabin fume exposure events.

141. Based upon information and belief Defendants failed to notify the applicable aviation authorities as well as aircraft owners of the information that they were aware of and

which they had collected in regards to the incidence rates and severity of the air cabin fume exposure events.

142. As a direct and proximate result of Defendants' breaches, Plaintiff was caused to suffer and continues to be caused to suffer severe and permanent personal injury, physical, mental pain and suffering, past, present and future medical expenses, lost earnings and lost earning capacity, the need for aid and assistance and an impairment to his ability to enjoy life and attend to his usual activities.

143. At all material times, Plaintiff was in the exercise of due care and free from all comparative negligence.

WHEREFORE, Plaintiff demands judgment against Defendants for the aforementioned injuries and damages, together with costs, interest and reasonable attorney's fees.

## COUNT II – BREACH OF EXPRESS AND IMPLIED WARRANTIES

144. Plaintiff repeats and incorporates herein the preceding paragraphs as if each set forth here in its entirety.

145. Defendants designed, manufactured, inspected, tested, marketed, owned, leased distributed, repaired, retrofitted and/or sold the Embraer ERJ-190 in general, and the subject AIRCRAFT, in particular, and its APU and ECS.

146. Defendants expressly and implicitly warranted to their customers and foreseeable users that the Embraer ERJ-190 in general, and the subject AIRCRAFT, in particular, was safe, merchantable and fit for the uses for which it was intended.

147. Plaintiff relied upon such warranties.

148. The subject AIRCRAFT, in particular, was defective and/or not reasonably safe for its intended purpose.

149. Defendants breached their warranties when they designed, manufactured, inspected, tested, marketed, owned, leased distributed, repaired, retrofitted and/or sold the Embraer ERJ-190 in general, and the subject AIRCRAFT, in particular.

150. As a direct and proximate result of Defendants' breaches, Plaintiff was caused to suffer and continues to be caused to suffer severe and permanent personal injury, physical, mental pain and suffering, past, present and future medical expenses, lost earnings and lost earning capacity, the need for aid and assistance and an impairment to his ability to enjoy life and attend to his usual activities.

WHEREFORE, Plaintiff demands judgment against Defendants for the aforementioned injuries and damages, together with costs, interest and reasonable attorney's fees.

**COUNT III – STRICT PRODUCTS LIABILITY**

151. Plaintiff repeats and incorporates herein the preceding paragraphs as if each set forth here in its entirety.

152. Defendants designed, manufactured, inspected, tested, marketed, owned, leased distributed, repaired, retrofitted and/or sold the Embraer ERJ-190 in general, and the subject AIRCRAFT, in particular, including the APU and ECS systems.

153. The Embraer ERJ-190 in general, and the subject AIRCRAFT, in particular, was defective and/or unreasonably dangerous in its design, testing and/or manufacture and posed a substantial likelihood of harm.

154. Such dangers/defects were beyond the extent contemplated by ordinary and/or expected users and/or customers.

155. Such dangers/defects were such that the foreseeable and known risks to users and/or customers exceeded the benefits associated with the design and/or formulation.

156. It was feasible to design the product in a safer manner and/or retrofit those aspects of the original design that were unreasonably dangerous.

157. Plaintiff was an expected and/or intended user of the subject AIRCRAFT.

158. Defendants knew or should have known in the exercise of reasonable care of the dangers posed by the Embraer ERJ-190 in general, and the subject AIRCRAFT, in particular.

159. Defendants failed to provide adequate and/or reasonable notice to expected or intended users of the Embraer ERJ-190 in general, and the subject AIRCRAFT, in particular, of the dangers/defects of the Embraer ERJ-190 in general, and the subject AIRCRAFT, in particular.

160. The defective design and related failures were a substantial factor in causing the Plaintiff's injury.

WHEREFORE, the Plaintiff demands judgment against Defendants for the aforementioned injuries and damages, together with costs, interest and reasonable attorney's fees.

## COUNT IV – NEGLIGENT MISREPRESENTATION AND FRAUD

161. Plaintiff repeats and incorporates herein the preceding paragraphs as if each set forth here in its entirety.

162. Defendants engaged in false representations concerning the severity and frequency of fume events.

163. As set forth in detail above, Defendants engaged in false representations and concealments which resulted in Plaintiff's injuries and damages.

164. Defendants told Plaintiff that the fume events were not harmful and/or that their reaction was a product of emotional angst.

165. Defendants, individually and collectively, failed to report instances of fume events and discouraged reporting so its aircraft were not down for service.

166. The HONEYWELL DEFENDANTS provided faulty and defective APUs and ECSs, which were known to HONEYWELL DEFENDANTS as defective and risk the safety of anyone flying on aircraft equipped with their APUs or ECSs.

167. Defendants, individually and collectively, underreported fume events, and failures in their ERJ-190s, APUs and ECSs to ensure that fume events were kept quiet.

168. Defendants knew that the statements they made were false.

169. Defendants systematically covered up the facts, which caused serious and permanent injury to Plaintiff.

170. Plaintiff relied upon Defendants' statement, which were false.

171. As a result, Plaintiff was seriously and permanently injured.

WHEREFORE, Plaintiff demands judgment against Defendants for the aforementioned injuries and damages, together with costs, interest and reasonable attorney's fees as well as punitive damages.

## COUNT V – PUNITIVE DAMAGES

172. Plaintiff repeats and incorporates herein the preceding paragraphs as if each set forth here in its entirety.

173. Defendants were long aware of the avoidable dangers posed by their product and ignored and/or actively concealed such dangers and injuries suffered by numerous end users including passengers and crew.

174. Defendants' conduct as set forth herein was willful, wanton and outrageous and exhibits an utter disregard to Defendants' civil obligations, best practices and societal norms.

175. The Embraer ERJ-190 in general, and the subject AIRCRAFT, in particular, was defective and/or unreasonably dangerous in its design, testing and/or manufacture and posed a

substantial likelihood of harm. Said condition was known to the Defendants at the time of manufacture and sale.

176. Defendants' acts and/or omissions were a substantial factor in causing the Plaintiff's injury.

WHEREFORE, Plaintiff demands judgment against Defendants for the aforementioned injuries and damages, together with costs, interest and reasonable attorney's fees as well as punitive damages.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment and relief on all Causes of Action as follows:

1. An Order awarding Plaintiff compensatory, general and special damages, and punitive damages in an amount to be proven at trial;
2. For medical monitoring;
3. Pre-judgment and post-judgment interest
4. Attorney fees and costs;
5. Such other relief as determined by this Court.

**JURY DEMAND**

Plaintiff respectfully requests that a jury be convened to try the factual issues of this case.

Dated: November 11, 2026

THE WILSON LAW GROUP

*/s/ Derell D. Wilson*

Derell D. Wilson, Esq.
1225 Franklin Avenue, Suite 500
Garden City, New York 11530
(516) 280–2081
*Attorneys for Plaintiff*